FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

C  MAR -2  AM 11:27

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| MELISSA DOTY, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | CIVIL ACTION CV 98-J-2802-J |
| CAVALIER MANUFACTURING, INC., | ) | |
| Defendant. | ) | |

ENTERED

MAR  2 2000

## MEMORANDUM OPINION

This cause comes before the Court is Defendant's Motion for summary judgment (doc. 32).

### Undisputed Facts

In the light most favorable to the plaintiffs, the facts of this case are as follows:

Defendant Cavalier Manufacturing Inc. is a housing manufacturer. Its Buccaneer Homes Division operates three plants located in Hamilton and Winfield Alabama ("Buccaneer I," "Buccanneer II," and "Buccaneer III"). Nix Decl. at ¶ 12. An individual seeking employment with Buccaneer Homes at any of the three plants after January 1998[1] must fill out an application at the Hamilton plant. Deposition of Teresa Nix ("Nix Depo")

---

[1] At the time of Ms. Sparks' initial application with Buccaneer, applicants went directly to the plant of their choice, each plant having the same application process as outlined above with the exception that each plant took separate applications rather than one location taking applications for the company as a whole.

1

at 117-118. If there are jobs immediately available the Human Resource Director, Teresa Nix, will try to match up those applications with these jobs. Nix Depo. at 121. Where there are no jobs immediately available, all completed applications are placed in a temporary folder. *Id.* These applications will stay in the folder for thirty days after which time they expire. Nix Depo. at 62. A sign in the office, as well as a notation on the application, encourages all applicants to reapply every thirty days. Nix Depo. at 84.

All applications over thirty days are placed in an expandable folder in alphabetical order. Nix Depo. at 116. These applications are cleaned out once a year. Nix Depo. at 64. Only when there are no current applications to chose from does Ms. Nix review the ones in the expandable folder. Nix Depo. at 121. In determining which applications from the expandable folder to review, Ms. Nix considers whether they called regarding the status of their application and whether she has checked references on that application. *Id.* References are checked only on the applications with a favorable work history. Nix Depo. at 121. If no applicant stands out in her mind, Ms. Nix simply pulls applications from the beginning of the alphabet until the positions are filled. Nix Depo. at 122-123.

Plaintiff Sparks applied for a job on July 29, 1996. Deposition of Patty Jo Sparks ("Sparks Depo.") at 152. The Human Resources Director for the plant at that time was Shana Holley.[2] Declaration of Shana Holley at ¶ 3. Ms. Holley reviewed Ms. Sparks' application and attempted to contact her twice regarding possible employment at the

---

[2] *See* FN 1.

2

plant. Deposition of Shana Holley("Holley Depo.") at 19; Deposition of Dale Gilliland ("Gilliland Depo.") at 229. Both attempts to reach Ms. Sparks were unsuccessful. Holley Depo. at 24.

Plaintiff Doty maintains she applied for various positions at least seven times since 1994.[3] Deposition of Melissa Doty ("Doty Depo.") at 149. Buccaneer has no record of any application completed by Ms. Doty other than the one off which she was hired. Nix Depo. at 65. Neither Doty nor Sparks were ever called in for an interview before January of 1998. Sparks Depo. at 221.

On December 11, 1997, Sparks, Doty and Virginia Enis[4] filed complaints with the EEOC alleging they had applied for jobs with Buccaneer Homes but were not hired due to their race and gender. *See* Doty Depo. at Exh. 5; Sparks Depo. at Exh. 3. Upon learning of these charges, Buccaneer Homes[5] invited the three women to come to the Hamilton plant and reapply for jobs. Doty Depo at 169; Sparks Depo. at 76.

When Plaintiffs arrived at the plant the next day, they were taken into a conference room with Ms. Nix and Dale Gilliland, Buccaneer's Production Manager. Doty Depo. at 171; Sparks Depo. at 87; Nix Depo. at 56. While there filling out the applications, Ms.

---

[3] Plaintiff maintains she filed her first application with Buccaneer I and two or three subsequent applications with Buccaneer II.

[4] Ms. Enis is not a party to this action

[5] There is an issue as to who placed the call. It is, however, undisputed that the call came from someone with authority at Buccaneer.

Sparks became noticeably angry, snapping at Ms. Nix, requesting to speak with her attorney and grabbing the clipboard. Sparks Depo. at 83-84, 92 ; Doty Depo. at 182; *see also* Nix Depo. at 168-69. In fact, any questions asked of Ms. Sparks were answered by Ms. Doty because Ms. Doty felt Ms. Sparks was too angry. Sparks Depo. at 84. Ms. Sparks attributes her anger to the fact that she knew she would get the job and because she needed an attorney to help her get the job. Sparks Depo. at 83, 90.

Though Ms. Doty and Ms. Enis were hired that day, Ms. Sparks was not. Sparks Depo. at 96-97. During the interview, Ms. Sparks was told by Mr. Gilliland that she had a bad attitude and, because of this, would not be hired. Sparks Depo. at 97, 228. Mr. Gilliland was concerned that, if he hired Ms. Sparks, she would be "hard to deal with on issues and that she would be just uncooperative and she would be hard to get along with other employees." Deposition of Dale Gilliland ("Gilliland Depo.") at 275. Ms. Nix acknowledges that the decision not to hire Ms. Sparks was based on her attitude rather than on her qualifications. Nix Depo at 150.

Ms. Doty began work on January 26, 1998. Doty Depo. at 15. Initially, Ms. Doty was assigned to rough clean and hanging shower doors. Her foreman in this position was Tim Nunn. Doty Depo. at 69. Shortly after she began working in that department, in February 1998, Ms. Doty filed a complaint against Mr. Nunn stating Mr. Nunn asked her if she could handle her job. Doty Depo. at 77; Harassment Complaint; Defendant's Exh. A. Apparently, Ms. Doty was not performing her task as quickly as her predecessor. *See*

4

Memorandum to File, Defendant's Exh. C.  Ms. Doty acknowledges she was slow but nonetheless found the comment objectionable because she felt that "everyone is an individual and should be treated that way." Harassment Complaint; Defendant's Exh. A. During a meeting between Ms. Doty and Mr. Gilliland regarding this incident, Ms. Doty requested she be transferred to another department.  Memorandum to File, Defendant's Exh. C.  Ms. Doty was transferred effective April 20, 1998 to Drywall Building. Memorandum to File, Defendant's Exh. D.  There, her supervisor was Mr. Ben Dudley.[6] *Id.*

After her transfer to drywall, her work remained deficient.  Declaration of Don Kelly ("Kelly Decl.") at ¶ 4.  Despite this deficiency she received two raises, reaching top pay for her position six months after she was hired.  Kelly Decl. at ¶ 6.  Also during this time, Mr. Kelly and Ms. Nix twice spoke with Ms. Doty regarding absenteeism.  The first time, June 24, 1998, Ms.Doty lied about her whereabouts as well as the reason for her absence.  Nix Depo. at 271- 272.  Kelly Decl. at ¶ 8.  No disciplinary action was taken on that date.  *Id.*  The second and final occasion where absenteeism was discussed with Ms. Doty was September 2, 1998.  Apparently, Ms. Doty went home at lunch and, without permission did not return on August 31, 1998.  Doty Depo. at 129; Declaration of Teresa Nix, Defendant's Exh. E. On this occasion, Ms. Doty told Mr. Kelly to find out

---

[6] While Dudley was Ms. Doty's supervisor in fact, due to his minimal experience as a supervisor, Mr. Kelly took on the direct supervision of Ms. Doty.

who was calling her "nigger" instead of responding directly to the discussion of
absenteeism.[7] Kelly Decl. at ¶ 8. Mr. Kelly asked Ms. Doty if she would be interested in
discussing the matter of racial slurs with Mr. Gilliland and she declined. *Id.* After that
incident, Ms. Doty returned to work only to collect her paycheck. *Id.*

The events occuring after Ms. Doty left Buccaneer are in dispute. According to
Mr. Gilliland, when Ms. Doty returned to Buccaneer to pick up her final paycheck, Mr.
Gilliland asked to see her. Doty Depo. at 212. Mr. Gilliland found Ms. Doty to be
unwilling to participate in an investigation into her charge that Buccaneer employees
directed racial slurs toward her. Gilliland Depo. at 15. Mr. Gilliland asked Ms. Doty to
sit down with him, Mr. Satterwhite, and Ms. Pitts, but she refused. Gilliland Depo. at 24.
Mr. Gilliland asked her if she wanted to fill out a complaint and she said no. *Id.* at 25.

In contrast, Ms. Doty maintains she was willing to address the issue of the racial
slurs and participate in an investigation. Doty Depo. at 212-213.

---

[7] Apparently, Doty is referring to Ms. Deborah Pitts. Ms. Doty testified:
  She was in the bathroom [before work] . . . . And she said I had to
  clean the bathrooms yesterday in the dark because something was
  going on with the power or something. And she said how does it
  look. And I said not bad for a blind woman, because she said she
  done it in the dark. I made a joke, thought nothing else about it.
  And she said what nigger would say that."

Doty Depo. at 126- 127. Ms. Pitts maintains the entire conversation was in jest.

## Standard of Review

Summary judgment under Rule 56 is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the burden of proof on such motion. *See Gonzalez v. Lee County Housing Authority,* 161 F.3d 1290, 1294 (11th Cir. 1998)(*citing Celotex* 477 U.S. at 323).

If the summary judgment movant satisfies its initial burden of production, the burden of proof shifts to the nonmovant who must demonstrate that a genuine issue of fact exists for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a jury could return a verdict in its favor. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admission on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. Once the nonmovant has adduced evidence of a genuine issue of material fact, its "allegations [will be] taken as true, and [it] will receive the benefit of the doubt

7

when [its] assertions conflict with those of the movant." *Gonzalez*, 161 F.3d at 1294

(*citing Anderson*, 477 U.S. at 255.).


## **Legal Analysis**

Ms. Sparks sues under Title VII and 42 U.S.C. § 1981, alleging Buccaneer's

failure to hire her was impermissibly based on race and gender.[8]  Ms. Doty sues under

Title VII and 42 U.S.C. § 1981 as well, alleging she was subjected to a racially hostile

environment and was constructively discharged from her position at Buccaneer Homes.

Complaint at ¶¶ 14, 18.   Additionally, Ms. Doty makes a claim based on failure to hire

for applications for employment in 1997.   Both Plaintiffs have voluntarily dismissed the

failure to promote and unequal pay claims.


<u>Plaintiffs Doty and Sparks' Disparate Impact Claim:</u>

Though not present in their EEOC complaints and unclear from the face of the

complaint commencing this action, it seems as though Plaintiffs have attempted, through

the use of an expert witness as well as deposition testimony of virtually all of the

witnesses, to include a claim under a disparate impact theory.   Plaintiff's Brief in

Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Brief") at 13- 16.

---

[8] Neither Sparks nor Doty seriously contend they have been subjected to gender discrimination, doing no more than listing it in their complaint.

To make a prima facie case under the disparate impact theory, a plaintiff must isolate and identify "the specific employment practices that are allegedly responsible for any observed statistical disparities." *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656, 109 S.Ct. 2115, 2124 (1989) (*quoting Watson v. Fort Worth Bank & Trust Co.,* 487 U.S. 977, 994, 108 S.Ct. 2777, 2788, 101 L.Ed.2d 827 (1988)). Causation constituting an essential part of the prima facie case, "a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." *Id.* at 657, 109 S.Ct. at 2124.

In the case at bar, Plaintiffs have done nothing more than show a racial imbalance in the workforce. Such a showing is insufficient to sustain a disparate impact claim under Title VII absent evidence some employment practice is the cause for this imbalance. *See Id.* at 657, 109 S.Ct. at 2124. Accordingly, Plaintiffs' claims under the disparate impact theory fail.

### Plaintiff Spark's Failure to Hire Claim:

The threshold question is whether Ms. Sparks' EEOC complaints were filed timely. Ms. Sparks filed two complaints with the EEOC, one on December 11, 1997 and another on September 16, 1998. *See* EEOC Complaint # 130980821, Sparks Depo. at Exh. 3; EEOC Complaint #130983642, Sparks Depo. at Exh. 4 (respectively). As a result of the first complaint, Ms. Sparks was invited down to interview with Buccaneer. Sparks

9

Depo. at 222-223. Mr. Gilliland testified at his deposition that the company did "everything possible to try to put [her] to work and give [her] a job." Gilliland Depo. at 230- 231. Due to Ms. Sparks' undisputedly poor behavior, she was not hired. Sparks Depo. at 83-84, 92; Doty Depo. at 182; Nix Depo at 168-169. Ms. Sparks received a right to sue letter on the first complaint in August of 1998. Sparks Depo. at Exh. 6. This action was filed on November 5, 1998 (doc. 1), within 90 days after the receipt of the right to sue letter.

Despite the fact Ms. Sparks filed this action within the appropriate time frame, Buccaneer argues her claim should be barred as untimely because more than 180 days had past between the allegedly discriminatory act and the filing of the EEOC complaint. *See* 42 U.S.C. § 2000e-5(e)(1). Buccaneer sets the date of the allegedly discriminatory act giving rise to the complaint as July 29, 1996, the date on which Ms. Sparks had last applied for a position with Buccaneer. Ms. Sparks argues that the complaint was filed timely given the testimony of Ms. Nix regarding the time period under which an application stays "active." Plaintiff's Brief at 16-17. According to Ms. Sparks then, Ms. Sparks could file a timely EEOC complaint within 180 days after July 29, 1997.

Under Ms. Sparks' theory, the defendant continuously violates her civil rights secured under Title VII for one year after the application for employment is completed.[9]

_____

[9] It is under this theory that Ms. Sparks filed her second EEOC complaint which on its face was time barred as Ms. Sparks interviewed for, and was denied, the position on January 26, 1998, more than 180 days prior to her filing the second EEOC complaint.

10

The Court disagrees with this assertion.  A claim under Title VII for failure to hire cannot

constitute a continuous violation absent a showing some policy or test used in the hiring

process gives present effect to a previous act.  Failing to show the refusal to hire was the

result of an ongoing discriminatory policy leading to the reasonable inference that Ms.

Sparks would never have been hired without requiring her to prove the need for

Buccaneer to hire her within that year, the 180 day period began to run on the date she

was informed she would not be hired.

Assuming *arguendo* that Ms. Sparks' EEOC complaint sufficiently alleged a

continuing violation and is therefore timely, the Court proceeds with the analysis of her

failure to hire claim.  A Title VII Plaintiff offering no direct evidence of discrimination

may proceed under the statutes with circumstantial evidence.  In evaluating whether such

a plaintiff has offered sufficient circumstantial evidence to present his or her case to a

jury, the Court implements the familiar legal framework outlined in *McDonnell Douglas*

and its progeny.  *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S.

248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  Under this framework, the Plaintiff has the

initial burden of establishing a prima facie case of discrimination.  *McDonnell Douglas,*

411 U.S. at 802, 93 S.Ct. at 1824.

In a failure to hire claim, plaintiff's prima facie case is set out as follows: (i) that

she belongs to a racial minority;  (ii) that she applied and was qualified for a job for

11

which the employer was seeking applicants;  (iii) that, despite her qualifications, she was rejected;  and (iv) that, after her rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications or in fact filled the positions with persons outside the plaintiff's protected class. *Walker v. Mortham,* 158 F.3d 1177, 1186 (11th Cir. 1998)(citations omitted); *see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.   Satisfaction of the prima facie case does not require the plaintiff to show he or she was as qualified or more qualified than the individual hired for the position.  *See Walker,* 150 F.3d at 1186.

In the case at bar, Ms. Sparks has failed to identify any openings that would have made her application once again subject to review.  Absent such a showing, Ms. Sparks can not prove her prima facie case, as she has failed to prove there was a time where her application was reviewed and she was not hired.  Additionally, even if there were openings available for applications, Ms. Sparks' failure to allege those openings were filled by someone outside a protected class is fatal to her claim.  In essence, Ms. Sparks' invites the Court to hold that where a qualified plaintiff has applied generally for a position with a defendant-employer and only presents evidence the defendant employer hires regularly, the Court can assume the plaintiff has established her prima facie case. The Court declines this invitation.

Despite Ms. Sparks' failure to satisfy her prima facie case, the Court continues on with the failure to hire analysis only to point out Buccaneer's established a legitimate,

12

nondiscriminatory reason for not hiring Ms. Sparks in January 1998. The establishment

of the prima facie case creates a presumption of unlawful discrimination, a presumption

that causes the burden of production to shift to the employer to articulate a legitimate,

nondiscriminatory reason for the challenged employment action. *See St. Mary's Honor*

*Center v. Hicks,* 509 U.S. 502, 506-507, 113 S.Ct. 2742, 2747 (1993); *see also Burdine,*

450 U.S. at 254, 101 S.Ct. at 1094. The burden of production is satisfied where the

evidence offered by defendant "raises a genuine issue of fact as to whether it

discriminated against Plaintiff." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527 (11[th]

Cir. 1997)(*citing Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094)). This burden is

exceedingly light. *Walker v. Nationsbank of Florida, N.A.,* 53 F.3d 1548, 1556 (11th Cir.

1995)(citations omitted).

In the present action, it is undisputed that Ms. Sparks' attitude was, at best, poor

during the application and interview process. Sparks Depo. at 83-4, 92; Doty Depo. at

182; Gilliland Depo. at 275-6; Nix Depo. at 168-9. An uncooperative, antagonistic

attitude constitutes a legitimate, nondiscriminatory reason for purposes of satisfying the

defendant's burden in the analysis. *See Corbin v. Southland International Trucks,* 25

F.3d 1545, 1550 (11th Cir. 1994). Where, as here, Buccaneer clearly produces a

nondiscriminatory reason for its adverse employment decision, legally sufficient to justify

judgment in favor of the defendant, the burden is met and the presumption of

discrimination arising out of plaintiff's prima facie case has been eliminated. *See Walker,*

13

158 F.3d at 1184; *see also Trotter v. Board of Trustees of the Univ. of Ala.,* 91 F.3d 1449,
1455 (11th Cir.1996).

Once the prima facie case has been eliminated, a plaintiff can avoid summary

judgment only if she is able to show that a genuine dispute of material fact exists as to

whether the defendant's articulated reason was pretextual. A reason cannot be proven

pretextual unless it is shown both that the reason was false, and that discrimination was

the real reason. *Mitchell v. USBI Company,* 186 F.3d 1352, 1355 (11th Cir. 1999) (*citing*

*Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1228 (11th Cir.1993). Having conceded

her behavior was poor, Ms. Sparks cannot now contend the reason Buccaneer decided not

to hire her was pretextual. Moreover, Buccaneer has offered evidence indicating they not

hired an applicant based on their attitude on at least one other occasion. *See* Nix Depo. at

150; *see also Corbin,* 25 F.3d at 1550 (though attitude constituted a legitimate,

nondiscriminatory reason for firing the plaintiff, plaintiff had met his burden of proving

that reason was pretextual through evidence of a similarly-situated individual who was

not fired). Ms. Sparks' burden of proving pretext falls short as she has failed to prove a

similarly situated individual outside her protected class was hired despite his or her bad

attitude or provide any other evidence supporting the inference discrimination was the

real reason Buccaneer did not hire her.

Based on the foregoing analysis, Ms. Sparks' claim under Title VII for failure to

hire fails. Accordingly, Buccaneer's motion for summary judgment as to this claim is

14

GRANTED.

Plaintiff Doty's Failure to Hire Claim:

Ms. Doty filed a complaint with the EEOC on the same day as Ms. Sparks alleging

failure to hire as well. Doty Depo. at Exh. 5. Likewise, Ms. Doty received her right to

sue letter on August 10, 1998. Doty Depo. at Exh. 16. In this instance, the fact Ms. Doty

was hired by Buccaneer after filing the EEOC complaint, is fatal to her claim for failure

to hire. Ms. Doty contends she had applied for jobs with Buccaneer  prior to the

application off which she hired. However, Ms. Doty has presented no evidence of these

previous applications and, unlike Ms. Sparks, there is no application on record with

Buccaneer.

Having failed to prove she ever applied, much less offering any evidence of her

qualifications, existence of openings, etc. with Buccaneer, Ms. Doty has failed to meet

her burden of establishing a prima facie case.  Consequently, Buccaneer's motion for

summary judgment as to Ms. Doty's failure to hire claim is GRANTED.


Plaintiff Doty's Hostile Environment Claim:

In order to be actionable under Title VII, a racially hostile environment must be

both objectively and subjectively offensive, one that a reasonable person would find

15

hostile or abusive to alter the terms and conditions of employment,[10] and one that the victim in fact did perceive to be so. *Faragher v. City of Boca Raton,* 524 U.S. 775,786, 118 S.Ct. 2275, 2283 (1998)(*citing Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22, 114 S.Ct.367, 370-371 (1993)). To insure that Title VII does not become a 'general civility code,' courts are instructed to look at the totality of the circumstances in determining whether the environment is sufficiently hostile or abusive. *See Id.*

In support of her claim of a racially hostile environment, Ms. Doty testified she was subjected to racial slurs, stares and was told that a member of management would not have her in his department because she was black and female. Doty Depo. at 42-44, 46-47, 51. Ms. Doty alleges she was referred to as a "damn Afro-American" by one of co-workers. *Id.* at 53. Ms. Doty additionally alleges Kevin Upton, another foreman at the plant, made racially derogatory remarks about another black employee. Doty Depo. at 55-57. Finally, Ms. Doty maintains that on one occasion she was called a "nigger" by a co-worker. Doty Depo. at 125-128.[11]

---

[10] The Court recognizes that a tangible employment action, such as demotion or discharge, constitutes an alteration in the terms and conditions of the plaintiff's employment. *See Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1247 (11th Cir. 1998)(*citing Burlington Indus., Inc. v. Ellerth,* 118 S.Ct. 2257, 2268, 524 U.S. 742, 141 L.Ed.2d 633 (1998). However, because Ms. Doty's claim for constructive discharge, discussed *infra,* fails, it is not considered in this analysis.

[11] In her brief in opposition to summary judgment, Ms. Doty includes other racially charged incidents. However, because they constitute hearsay, they were not considered in granting defendant's motion. For instance, Ms. Doty alleges "[t]here were incidents at the Winfield plant involving a hanging noose being placed over a black male's work station and a

16

The objective component of the hostile environment analysis is somewhat fact

intensive.  To aid in this determination,  the Supreme Court and the Eleventh Circuit have

articulated four factors to be considered: "(1) the frequency of the conduct;  (2) the

severity of the conduct;  (3) whether the conduct is physically threatening or humiliating,

or a mere offensive utterance;[12]  and (4) whether the conduct unreasonably interferes with

the employee's job performance." *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th

Cir. 1999)(internal citations omitted).

In determining the severity and frequency of the racially hostile conduct Ms. Doty

was allegedly subjected to, the Court is mindful of the extreme degradation associated

with the use of the word "n-word."  Nonetheless, the circumstances as alleged by Ms.

Doty do not give rise to the inference that the racial slurs allegedly spoken by co- workers

had to be so "commonplace, overt and denigrating that they created an atmosphere

charged with racial hostility."  *E.E.O.C. v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068

(11th Cir.1990).  Ms. Doty has listed four racially charged incidents over a period of six

months.  Of the alleged incidents, only two were uttered by co-workers.  Doty Depo. at

drawing on the bathroom wall of a black male with a noose around his neck and the letters
"KKK" on the wall."  Sparks Depo. at 226- 227.  However, Ms. Doty never worked at the
Winfield plant.  In fact, those incidents were relayed not to Ms. Doty but to Ms. Sparks by Ms.
Sparks husband.  Indeed, there is no reason to believe Ms. Doty even knew of these incidents
while employed at Buccaneer.

[12] Ever mindful of the Supreme Court's caution against allowing too broad a definition of
hostile environment so that the claim operates as a general civility code, the Court holds today
that the word "nigger" clearly constitutes far more than a mere offensive utterance and will
always satisfy the third prong of this analysis.

17

53, 125-128. The only incident directed toward Ms. Doty occurred the day she quit when a white co-worker, after trading carefree remarks with Ms. Doty called Ms. Doty a "nigger" in the ladies restroom. Doty Depo. at 125-128. The two remaining incidents were spoken to another individual but, according to Ms. Doty were meant for her to hear, Doty Depo. at 46, 54-55. Even in the light most favorable to the plaintiff, these facts hardly lead to an inference that racial hostility was overtly commonplace at the Buccaneer plant.

Finally, as to the fourth and final prong, the Court examines whether the conduct unreasonably interferes with the employees performance. *See Mendoza,* 195 F.3d at 1246. The question of whether hostile or abusive conduct unreasonably interferes with a plaintiff's performance necessarily implies both a subjective and objective element. The plaintiff must subjectively believe his or her job performance has been affected by the conduct of which he or she complains. The analysis then proceeds to determine whether such a belief is reasonable. In the case at bar, Ms. Doty testified at her deposition that the comments made to her or in her presence did not affect her ability to work. Doty Depo. at 223-225. Failing to satisfy this subjective component, Ms. Doty's claim under hostile environment fails as she has fallen short of her burden of proving the conduct complained of was objectively offensive.

Assuming arguendo that Ms. Doty had established a claim of a racially hostile environment sufficient to withstand summary judgment, her claim still fails as she has not

18

proven actual or constructive knowledge of the harassment on the part of Buccaneer.

To prove that her employer is directly liable for the hostile environment harassment of a co-worker, a plaintiff must show that the employer knew or should have known of the harassment and failed to take prompt action to remedy the situation. *See Coates v. Sundor Brands, Inc.,* 164 F.3d 1361 (11th Cir.1999). Following the decision in *Faragher,* the Eleventh Circuit has continued to apply a negligence or "direct liability" standard when analyzing an employer's liability for a hostile environment created by a co-worker with no supervisory authority. *See Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1363-64 (11th Cir.1999). Accordingly, a plaintiff can prove that an employer knew or should have known of harassment by showing either that she complained to higher management or by showing that the harassment was pervasive enough to charge the employer with knowledge. *Henson v. City of Dundee,* 682 F.2d 897, 905 (11th Cir.1982).

It is undisputed that Buccaneer did not have actual knowledge of the racial hostility. Ms. Doty testified at her deposition she did not report any of the incidents until the day she resigned. Doty Depo. at 230. Regardless, even if Buccaneer was entitled to summary judgment with respect to its actual knowledge of the harassment at issue, Ms. Doty could succeed on her claim if she can show that Buccaneer "should have known" of the behavior.

Ms. Doty has failed to demonstrate that the harassment she faced was pervasive

19

enough to charge Buccaneer with constructive knowledge. This inquiry is distinct from the question of whether the environment is sufficiently hostile to support a claim for harassment in the first place. *Allen v. Tyson Foods,* Inc., 121 F.3d 642, 647 (11th Cir.1997). Factors considered to determine whether harassment is so pervasive as to provide constructive notice to an employer are:  the remoteness of the location of the harassment, whether the harassment occurs intermittently over a long period of time, whether the victims were employed on a full or part time basis, and whether there were only a few discrete instances of harassment. *Id.*

The testimony of Ms. Doty and various other Buccaneer employees reveals the following as it pertains to this analysis: (1) one of the two alleged incidents involving co-workers occurred outside the presence of anyone other than Ms. Doty and the utterer of the offensive remark, the other comment was made during the lunch break; (2) the first harassing statement occurred when Ms. Doty first began her job, the second on the day she quit six months later; (3) Ms. Doty was employed on a full-time basis and (4) Ms. Doty can allege only four separate incidents of racial slurs or derogatory statements. Based on the foregoing, the Court does not find the actions complained of pervasive enough to impute constructive knowledge on Buccaneer.

In addition, Buccaneer has attempted to defend themselves from liability based on constructive notice by offering evidence of their anti-discrimination policy. Generally, "an employer is insulated from liability under Title VII for a hostile environment sexual

20

harassment claim premised on constructive knowledge of the harassment when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress." *Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548, 1554 (11th Cir.1997).

Deposition testimony reveals that Buccaneer Homes did in fact have a anti-discrimination policy. Doty Depo. at Defendant's Exh. 12. New employees were required to sign an acknowledgment after reading this policy. Doty Depo. at Defendant's Exh. 8. Information about equal employment and anti-discrimination policies was posted in the plant and managers were trained on various occasions regarding this policy. Nix Depo. at 29-30. Moreover, it is undisputed Ms. Doty knew this policy existed and clearly knew of her rights under Title VII.

Accordingly, assuming the conduct complained of by Ms. Doty was indeed pervasive enough to impute constructive knowledge on Buccaneer, Buccaneer's established anti-discrimination policy and Ms. Doty's failure to use such policy operates to insulate Buccaneer from liability. *Cf. Morgan v. Fellini's Pizza, Inc.,* 64 F.Supp 2d 1304, 1315 (N.D. Ga. 1999) ("policy" of a few sentences contained within employee obligations regarding working hours and alcohol policy that was neither discussed with employees nor posted at the workplace and on which managers received no training was insufficient proof, as a matter of law, of a valid anti-discrimination polciy).

Finally, to the extent Ms. Doty complains of harassment by supervisors at

21

Buccaneer, the Court finds Ms. Doty's failure to report these incidents to her supervisor fatal to her claim of a racially hostile environment. In *Faragher,* the Supreme Court held that an affirmative defense to the hostile environment claim exists where "the employer exercised reasonable care to prevent and correct promptly any [] harassing behavior, and that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807-808; 118 S.Ct. at 2293. Evidence the plaintiff failed to use an established complaint procedure is sufficient to satisfy the defendant-employer's burden under this defense. *Id.*

It is undisputed that Buccaneer had an established procedure through which employees could complain of discriminatory conduct. Doty Depo. at Defendant's Exh. 12. Ms. Doty's knowledge of this procedure is not in dispute and is further evidenced by the fact that, upon employment with Buccaneer, Ms. Doty was required to read and acknowledge her reading of the outlined procedure in her employment package. Doty Depo. at Defendant's Exh. 8. Despite the fact she was aware of Buccaneer's harassment policy, Ms. Doty failed to report[13] the racial slurs of which she now complains. Having

---

[13] In support of her claim Ms. Doty, though admitting she never told anyone about any of the other incidences, testified she told Mr. Kelly about the incident but only after she resigned later that same day. Ms. Doty makes much of the fact Buccaneer's investigation of the incidents entailed little more than speaking with those accused to determine the validity of these allegations. The Court holds that, while for obvious reasons it would certainly be prudent for an employer to investigate discriminatory allegations made by individuals who make their complaints for the first time when they resign from their employment, liability under Title VII

22

failed to report this conduct, Buccaneer is insulated from liability for the acts of their supervisors.

### Plaintiff Doty's Constructive Discharge Claim:

Ms. Doty further claims that she was constructively discharged by Buccaneer in violation of Title VII. Complaint at ¶ 14. "[W]hen an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII." *Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir. 1993 ) (*citing Henson v. City of Dundee,* 682 F.2d 897, 907 (11th Cir.1982). In addition to showing she resigned to escape the intolerable conditions, Ms. Doty "must demonstrate that [her] working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign." *Morgan,* 6 F.3d at 756 (*citing Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1317 (11th Cir.1989).

Though there is little guidance as to what constitutes "intolerable" conditions for purposes of constructive discharge under Title VII, it is clear that "a plaintiff must show more than just a Title VII violation by her employer in order to prove that she has been constructively discharged." *Howard v. Burns Brothers, Inc.,* 149 F.3d 835, 842 (8th Cir.

---

does not extend to employers who informally investigate complaints after the resignation of the claimant. Any holding to the contrary would undermine the Supreme Court's decision in *Burlington Industries v. Ellerth,* 524 U.S. 742, 765;118 S.Ct. 2257, 2270 (1998).

1998). Accordingly, Ms. Sparks' failure to show a racially hostile environment based on supervisory action precludes her from going forward with a constructive discharge claim.

Furthermore, an employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged. *See Garner v. Wal-Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987). The rationale for such a rule is that "society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships." *See West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 498 (8th Cir. 1995) (*quoting Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 66 (5th Cir.1980)). Ms. Doty's resignation on the same day she made the allegations of racial hostility clearly did not provide Defendant adequate time to respond and remedy the situation. Failing to give Defendant reasonable time to rectify the situation, Ms. Doty's claim for constructive discharge fails as a matter of law. Consequently, Defendant's motion for summary judgment as to the claim of constructive discharge is GRANTED.

Plaintiffs Doty and Sparks' § 1981 claim:

Both Ms. Sparks and Ms. Doty have made claims under 42 U.S.C. § 1981 alleging that Buccaneer unlawfully discriminated against her in the terms and conditions of her employment on the basis of her race, in violation of § 1981. Complaint at ¶ 18. To the

24

extent these claims relate to any actions by Buccaneer prior to November 1996, those claims are barred by the statute of limitations.[14] *See Patterson v. Augut Wiring Systems,* 944 F.Supp. 1509 (M.D. Ala. 1996).

In *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court narrowly interpreted the language of § 1981 by holding that § 1981 only provides a cause of action for discriminatory acts in making and entering contracts, and not for discriminatory acts in the performance of contracts. *Id.* at 176-78, 109 S.Ct. at 2372-73. Accordingly, the only cognizable claim under § 1981 in the case at bar is Buccaneer's failure to hire Ms. Sparks in January 1998.

To prove a violation of § 1981, the *McDonnell-Douglas* framework familiar to civil rights law is implemented. *Patterson,* 491 U.S. at 186, 109 S.Ct. at 2377. As Ms. Sparks failed to meet the initial burden of establishing a prima facie case for failure to hire under Title VII, she likewise fails to establish a prima facie case under § 1981 where the same factual allegations are applied to an identical legal analysis. Accordingly, Buccaneer's motion for summary judgment on Ms. Sparks' claims under § 1981 is due to be GRANTED.

---

[14] This necessarily includes allegations arising out of Sparks' July 1996 application.

25

## Conclusion

In consideration of all of the foregoing, the court is of the opinion that Defendant's motion is due to be granted.

It is therefore **ORDERED** by the court that Defendant's motion for summary judgment on all counts be and hereby are **GRANTED**.


**DONE** and **ORDERED** this _2_ day of March, 2000.

Inge P. Johnson
U.S. District Judge

26